Argued 10 December, 1903; decided 11 January, 1904.

## WHITE v. HOLMAN.

[74 Pac. 933.]

CONSTITUTIONAL PROHIBITION AGAINST MONOPOLIES.

1. Under Const. Or. Art. I, § 20, prohibiting the granting to any citizen or class of citizens privileges which shall not equally belong to all citizens on the same terms, a monopoly in a lawful and uninjurious business cannot be granted by the legislature.

SAILOR BOARDING HOUSES—STATUTES—POLICE POWER.

2. The keeping of a sailor's boarding house is not such an illegal business, or one so inherently injurious to the public, that the legislature may grant an exclusive right to conduct it. A monopoly in that business is unconstitutional, and therefore the statute creating the sailor boarding house commission (Laws 1903, p. 238) is either illegal or it cannot be construed as authorizing the board to arbitrarily license only one person or firm.

From Multnomah: MELVIN C. GEORGE and JOHN B. CLELAND concurring, ALFRED F. SEARS, JR., dissenting, in joint session.

This is a special proceeding by Harry V. White and William Smith to compel the defendants Herbert Holman, Edw. Wright, and S. M. Mears, who constitute the board of commissioners for licensing sailors' boarding houses, to grant to the petitioners authority to keep such a house. The alternative writ of mandamus states that the petitioners, owning a house of this kind in Portland, Oregon, have applied to the defendants for a license to conduct the same, presenting the necessary evidence of their qualifications therefor, and of the suitableness of their house for the accommodation of sailors, and offering to comply with the provisions of the act creating such board, but that their petition has been arbitrarily denied. The board was therein commanded to issue the license, upon the payment of the

fee prescribed, and the execution of a sufficient bond, or to show at a stated time why they had not done so. For answer to the writ the defendants denied its material allegations, and averred that they had established a rule that whoever applied for a license should produce recommendations from a reasonable number of the firms interested in shipping at the port for which the permit was desired, showing that the applicant therefor was qualified and had a suitable house for the business; that when the petitioners made their application the board notified them of this rule, and was informed that they could not comply therewith, whereupon a license was refused them. For a further defense it is alleged that, in denying the application, the board determined that the petitioners were not proper persons to carry on such business. The reply put in issue the allegations of new matter in the answer, and averred that the chairman of the board notified the petitioners that any recommendation they could secure would be useless, because it had been determined to issue but one license at the port of Portland, and that such permit was to be given to other persons; the board desiring to create a monopoly of such business. A trial being had, the alternative writ was made peremptory, and from the judgment so rendered the defendants appeal.                    AFFIRMED.

For appellants there was a brief and an oral argument, by *Mr. Henry E. McGinn.*

For respondents there was a brief over the name of *Wilson T. Hume.*

MR. CHIEF JUSTICE MOORE, after stating the facts as above, delivered the opinion of the court.

Though the refusal to issue the license to the petitioners is founded, in the answer, upon their alleged unworthiness and incompetency, such denial appears from the testimony to have been based upon the board's desire to limit the

business to only one sailors' boarding house at Portland, the managers of which had received a license prior to the petitioner's application therefor; thereby attempting to create a monopoly in that vocation. The defendant Edward Wright, as a witness in his own behalf, testified as follows: " When the board was organized, we made a rule that we would issue licenses only to people who were satisfactory to the parties directly interested in the shipping business—shipowners, for whom the law was passed." In referring to what the witness said to one of the petitioners, he further testified that he informed him, "that any time he could get a recommendation from the men representing the shipping community, or even a portion of them, we would issue him a license." On cross-examination, in referring to the petitioners, he was asked: "Didn't you tell those boys, White and Smith, that the reason you did not grant them a license was there was not money enough in the sailor boarding house business for two houses; there was only money enough for one house?" to which he replied: "Yes, sir." This witness, having testified that a license had been issued to another firm to keep a sailors' boarding house at Portland was also asked, in referring to several persons who were engaged in the shipping business at that port: "What did they advise you to do?" and answered: "They advised me to try and see if we could not get along with one sailor boarding house man here. Q. Who did they advise you to issue the license to? A. To Sullivan & Grant," the firm who secured the license prior to the petitioners' application therefor.

Section 3 of the statute creating the board of commissioners for licensing sailor boarding houses, and prescribing their duties, and the mode of executing them, is as follows: Such board shall organize for the transaction of business as soon as practicable after the passage of this act. They shall take the application of any person, firm, or cor-

poration for a license to keep a sailors' boarding house or sailors' hotel in this State, and upon satisfactory evidence to them presented of the respectability and competency of such applicant, and of the suitableness of his or their accommodations, and of his or their compliance with all the provisions of this act, shall issue to said person, firm, or corporation a license, which shall be good for one year and for no longer or shorter period, unless sooner revoked by said board, to keep a sailors' boarding house, or sailors' hotel in this State, at a place specified in the application, and to invite and solicit boarders and lodgers for the same; said board of commissioners for licensing sailors' boarding houses shall have the right to reject any application for a license provided by this act as they may deem advisable. Said commissioners shall, from their number, select their president, who shall, on behalf of said board, sign all licenses issued under the provisions of this act ": Laws 1903, p. 238. The right of the board to reject applications for licenses to conduct sailors' boarding houses made by persons who are unworthy or incompetent, or do not possess suitable accommodations therefor, or will not comply with the provisions of the act in question must be conceded ; and the refusal to issue the license, when based upon either of these grounds, will not be disturbed.

1. It will be remembered that the answer bases the refusal to issue the license on one of these grounds, but an examination of the testimony tends to show that the denial of the application was founded upon the theory that the issuance of only one license at the port of Portland would advance the shipping interests, improve the condition of seamen, and promote the welfare of the public. The action appears to have been tried in the lower court upon such theory, and, this being so, the question will be reëxamined here as if it were the sole issue. The defendant's counsel contend that the monopolizing of a business that can be

conducted with safety to the public only when licensed is a legitimate exercise of the police power of the State, and, to support this legal principle, rely upon the Slaughter-house cases, 83 U. S. (16 Wall.) 36, and other decisions following the rule there announced. In the leading case, an act was passed by the legislature of Louisiana locating stock landings and stockyards below the City of New Orleans; prohibiting the landing or slaughtering of animals whose flesh was intended for food within certain limits, except by a corporation thereby created, which was invested with sole power to erect stock landings, stockyards, and slaughter-houses, and compelled to permit any person to slaughter animals therein; prescribing the charges to be made for each animal so killed; providing for an inspection of all animals to be slaughtered; and closing at a given date all other stock landings and slaughterhouses within the in-hibited district. The Live Stock Dealers & Butchers' Asso-ciation of New Orleans and others, contending that the act created a monopoly that deprived them of their right to pursue a legitimate employment, instituted suits to test its constitutionality. The supreme court of that State hav-ing decided against the association and in favor of the corporation, the cause was taken by writ of error to the Supreme Court of the United States, where it was held by a majority that the grant of an exclusive privilege, guarded by proper limitation of the prices to be charged, and im-posing on the corporation the duty of providing ample convenience, with permission to all owners of stock to land and to all butchers to slaughter at those places, was a police regulation for the health and comfort of the people, within the power of the state legislature, unaffected by the Constitution of the United States, previous to the adop-tion of the thirteenth and fourteenth articles of amend-ment. The landing, inspecting, and slaughtering of ani-mals without the limits of the City of New Orleans was

certainly a legitimate exercise of the police power of the State, regulating the place where the business should be conducted : *City of Portland* v. *Meyer*, 32 Or. 368 (52 Pac. 21, 67 Am. St. Rep. 538). Many regard the flesh of animals suitable for food, and it must be admitted that the slaughter thereof for that purpose is a legitimate business, in which any citizen is entitled to engage as a matter of common right. Slaughterhouses, however well conducted or cleanly kept, are often repulsive to the senses, but, if negligently managed, they become filthy, thereby menacing the health of the public ; in either case rendering the business subject to police regulations. Section 20 of article I of the constitution of this State is as follows : " No law shall be passed granting to any citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens." The business of conducting a slaughterhouse being legitimate, the persons engaged therein possess a common right to pursue it; and it would seem that any restriction thereof, by legislative interference, that inevitably and materially reduces the number of persons so employed or who may desire to engage therein, is violative of their property rights.

Under a constitution like ours, any lawful business, the management of which might be injurious to the public, may be regulated so as to limit the place or to prescribe the manner in which it shall be conducted, provided that in doing so no privileges or immunities are granted to any individual or class of persons that shall not equally belong to all citizens upon the same terms. The monopoly feature of the act construed in the Slaughterhouse cases, above cited, appears to have been upheld upon the assumption that, though the place of conducting the business was prescribed, the number of persons engaged therein was not diminished or even limited, for Mr. Justice MILLER, in announcing the opinion of the majority of the court, says :

" But it is not true-that it deprives the butchers of the right to exercise their trade, or imposes upon them any restriction incompatible with its successful pursuit, or [of] furnishing the people of the city with the necessary daily supply of animal food." The reason assigned for the creation of a monopoly in that case is much impaired by the strong dissenting opinion by Mr. Justice Field, who, in his vigorous manner, shows its manifest injustice. In *Butchers' Union Co.* v. *Crescent City*, 111 .U. S. 746 (4 Sup. Ct. 652), the monopoly thus created was destroyed by a statute passed in pursuance of an amendment to the Constitution of Louisiana, whereby an equal privilege was granted to another corporation. The prior recipient of the legislative favor, contending that its grant was irrepealable, instituted a suit to prevent its rival from exercising the power attempted to be delegated ; and, the cause having been carried to the Supreme Court of the United States, it was. held that a legislature could not bargain away its inherent right to exercise police power ; Mr. Justice Miller writing the opinion, and Mr. Justice Field concurring therein, upon the ground that the monopoly feature was void from the beginning. The rule would thus appear to be settled that, unless inhibited by its organic law, a State may grant an exclusive right to carry on a lawful business ; but, under a constitution like ours, we feel satisfied that this cannot be done.

2. It is contended by defendants' counsel, however, that the keeping of a sailors' boarding house is an illegal business, which, in its very nature, is injurious to the community, and the legislative assembly, being the sole judge of the decree-of danger to which the public is exposed from that source, vested in this board power to reject any application for a license that they might deem advisable, thereby authorizing them to create a monopoly thereof, and hence the court erred in commanding the defendants

to issue a license to the petitioners. The State, in its sovereign capacity, as *parens patriæ*, is charged with the duty of guarding the interests of the community by protecting the lives, preserving the health and morals, and promoting the happiness of its subjects; and, as a corollary thereto, any employment that tends to subvert the obligation thus imposed may be regulated or prohibited by the legislative assembly. "And where an occupation," says Judge Cooley in his work on Torts (page 277), "is peculiarly susceptible of abuse, it may be proper for the State to surround it with special restrictions, and to require those who propose to enter upon it to take out a special license and give security for good behavior, and to refuse altogether to issue licenses to persons of known bad character." It is the danger to the public health, peace, or morals which is imminent or reasonably to be apprehended from the pursuit of any calling that renders the regulation or prohibition thereof by the State an exercise of its police power to avert the threatened peril. The degree of danger to the public is the measure of the remedy which the State may adopt to mitigate or prevent injury to its citizens. If the employment is only incidently hurtful, it may be regulated by license; but, if it is necessarily pernicious, it may be entirely prohibited. However partial it may seem, the State can create a monopoly of any business that may lawfully be prohibited by it on the grounds of public policy, without violating any constitutional inhibition, because no person possesses an inherent right to engage in any employment, the pursuit of which is necessarily detrimental to the public. Thus in *Plumb* v. *Christie*, 103 Ga. 686 (30 S. E. 759, 42 L. R. A. 181), it was held that no person has a property right to sell intoxicating liquors, and that the legislative assembly of a State, by virtue of its police power, has authority to regulate and control the sale thereof, and may create a monopoly by conferring the exclusive privi-

lege of engaging in such traffic upon a body corporate created for that purpose. In that case the right to create the monopoly was based upon the power of the State entirely to prohibit the sale of intoxicating liquors, Mr. Justice Lewis saying: "No principle, perhaps, is more universally recognized by the courts than the right of a State, under general powers reserved and granted to its legislature, to regulate and control the traffic in any commodity, the use of which may endanger either the public health or morals. It is equally well established that the sale of intoxicating liquors is peculiarly, on account of the evil effects resulting from their use, subject to legislative control and regulation. To such an extent can this power be exercised, that an absolute prohibition of the sale of this commodity throughout the State can be accomplished by an act of its legislature; and, among the number of cases reviewing such legislation, our attention has never been called to a single case in a court of last resort where the validity and constitutionality of such an act has not been upheld. If this power is conceded to a legislature, we can see no possible escape from the conclusion that it necessarily carries with it the right to regulate the exclusive sale under a direct supervision of the government." Mr. Tiedeman, in his work on State and Federal Control of Persons and Property (section 119), in speaking of the character of employment that is subject to legislative prohibition, says: "In order to justify a restrictive license, the business must itself be of such a nature that its prosecution will do damage to the public, whatever may be the character and qualifications of those who engage in it."

In view of these preliminary rules on the subject, if it be assumed that the commissioners for licensing sailors' boarding houses are the recipients of all the power that the legislative assembly could possibly delegate, their right to restrict the management of the business must

rest upon the determination whether or not the keeping of a sailors' boarding house is in itself of such a nature that its prosecution will necessarily damage the public, whatever may be the character or qualification of those who engage in it. Chancellor Kent, in his Commentaries (volume 3, *176), in speaking of seamen, says: "They are usually a heedless, ignorant, audacious, but most useful class of men, exposed to constant hardships, perils, and oppression. From the nature of their employment, and their 'home on the deep,' they are necessarily excluded, in a great degree, from the benefits of civilization, and the comforts and charities of domestic life. Upon their own element they are habitually buffeted by winds and waves and wrestling with tempests, and in time of war they are exposed to the still fiercer elements of human passions. In port they are the ready and dreadful victims of temptation, fraud, and vice." The testimony tends to show that, from his confinement during a long voyage, the common sailor, tired of the monotony of his environments, and anxious for a change of scenery and companions, frequently deserts the ship on the first opportunity. His enforced abstemiousness at sea often nurses an appetite for strong drink that is not satisfied by moderate imbibition on shore, and his state of inebriety is only measured by the sum of money he possesses. When this is gone, and he desires to continue his revelry, he becomes the willing victim of the agent of the sailors' boarding house, and mortgages his future services for a short term of board and lodging, and a small sum of money to gratify his passions. When the advances which he may secure on account of wages for another trip are nearly exhausted by exorbitant charges made by the boarding house keeper, he is induced by the latter to sign a contract for another voyage. It also frequently occurs that a man from the rural districts, unaccustomed to the sea, on his first visit

to a marine port determines to inspect the haunts of vice, and, after a protracted debauch, superinduced by drugged liquor supplied by agents of a sailors' boarding house, awakes to discover that he is on board a ship at sea, having signed articles as an "able seaman." It sometimes happens that, when seaman have been engaged for a round trip, it may be discovered upon the arrival of the vessel in a foreign port that the anticipated return cargo cannot be immediately secured; and, as the sailors usually have some money due them when the outward voyage is terminated, and their wages will necessarily continue until the ship can begin to load, the captain or other agent, in the interest of the owners, and to diminish the expenses incident to the delay, seeks the manager of a sailors' boarding house, and persuades him to induce most of the crew to desert. It is when the seamen have been engaged for a round trip, and the ship upon arrival can obtain immediate dispatch, or when the vessel, having been delayed in port, has secured a cargo and engaged seamen, to whom a part of their wages has been advanced, that their desertion seriously affects the interests of the shipowner. Under these conditions, competition in the sailors' boarding house is detrimental, for, when a vessel upon arrival can immediately secure a return cargo, the managers of these houses, by combining, may "shanghai" or persuade the seamen engaged for a round trip in a foreign port to desert, that, for a consideration, they may be furnished to another ship; or when a vessel, after waiting, secures a cargo and engages seamen from the keeper of a sailors' boarding house, his rivals at that port, not having been permitted to supply the men, may induce them to desert, for the same purpose; so that it is the delays and expense occasioned in the manner stated that subject the managers of sailors' boarding houses to much merited rebuke, and cause the

shipowners and managers to desire a monopoly in the business.

Notwithstanding the conditions here described usually prevail in dealing with sailors in most seaports, the evils depicted depend, not upon the business of keeping sailors' boarding houses, but upon the character of the men conducting them. It is possible for a person to be so imbued with a fraternal spirit, and so actuated by an earnest desire to aid seamen, that he could keep a boarding house for them where they would have a home surrounded by every influence that promotes sobriety and encourages morality. The keeping of a sailors' boarding house is not necessarily like the selling of intoxicating liquor to be used as a beverage, for that not only injures, but frequently makes a criminal, of the consumer, entailing misfortune and disgrace on his family, and imposing the costs of his prosecution and the expense of his punishment on the State; and whatever the character of the vendor of alcoholic drinks, or however well regulated his saloon or drug store may be, the traffic necessarily injures the public. Nor is the business sought to be guided by the act in question like the sale of powerful narcotics, to be employed for other than purely medicinal purposes, for the victim addicted to their excessive use is thereby rendered a physical, mental, and moral wreck, and his lack of vigor, intellectuality, and probity are an injury to himself, a loss to his family, and often an expense to the State. The keeping of a sailors' boarding house is, in our opinion, a legitimate business, in the performance of which any citizen may engage as a matter of common right; and, this being so, it must be assumed that the legislative assembly, having in view section 20 of article I of the constitution of the State, did not intend to restrict the business by limiting the number of persons who may engage therein, but, as such occupation is peculiarly susceptible of abuse, the

statute attempts to correct it by licensing those who possess the prescribed qualifications therefor, and who will comply with the provisions of the act, which is a valid grant of power. If it be conceded, however, that it was the intention of the legislature to invest the board of commissioners for licensing sailors' boarding houses with authority to reject any application for a license that they might deem advisable, without considering the prescribed qualifications of the applicant or the suitableness of his accommodations, the business sought to be restricted being legitimate, so much of the act as attempts to confer such arbitrary power is in violation of the organic law of the State, and therefore void.

It will be remembered that the board promulgated a rule by which licenses were to be issued to the keepers of sailors' boarding houses who could secure recommendations from persons engaged in shipping at the port of Portland. The act in question not having prescribed any regulation for the government of the board, or to aid them in determining the qualifications of applicants for a license, or the suitableness of their accommodations for keeping sailors, they probably had authority to adopt such reasonable rules as they deemed suitable and necessary, not inconsistent with the provisions of the act or contrary to the constitution of the State. The method selected by them to determine the persons who should receive licenses tends to create a monopoly of the business, for the shippers, by concerted action, could secure the appointment of only one person or firm, thereby excluding all competition. Whether or not such a mode of issuing licenses would advance the interests of shippers, or promote the public good, it is not necessary to inquire, for the board of commissioners for licensing sailors' boarding houses can exercise no greater power than was possessed by the legislative assembly; and, as that body could not create a monopoly of

a legitimate business in which every person can engage of common right, *a fortiori*, its creatures, the board, are likewise prohibited from doing so. It is possible that the petitioners are unworthy and incompetent, and therefore not entitled to a license; but, from an inspection of the bill of exceptions, we are forced to the conclusion that the refusal was based upon the board's desire to restrict the number engaged in the business, and, as we have attempted to show, that under a clause of our organic law a monopoly cannot be created in cases of this kind, it follows that the judgment should be affirmed, and it is so ordered.

Affirmed.

Decided 23 November, 1903; rehearing denied 1 March, 1904.