64 September 12, 2013 No. 37

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review*,

*v.*

TIFFANY LEE SAVASTANO,
*Respondent on Review.*

(CC C081586CR; CA A141053; SC S059973)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 20, 2012; resubmitted January 7, 2013.

Mary H. Williams, Deputy Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Ernest G. Lannet, Chief Deputy Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Charles F. Hinkle, Portland, filed the brief for *amicus curiae* ACLU Foundation of Oregon, Inc.

BALMER, C. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____
* Appeal from Washington County Circuit Court, Thomas Kohl, Judge. 243 Or App 584, 260 P3d 529, *adh'd to on recons*, 246 Or App 566, 266 P3d 176 (2011).

**BALMER, C. J.**

This case requires us to examine Article I, section 20, of the Oregon Constitution—the privileges or immunities provision—in the context of prosecutorial discretion. Specifically, we must determine whether Article I, section 20, applies to prosecutors' charging decisions and, if so, whether a prosecutor must consistently adhere to a coherent, systematic policy in making charging decisions.

Defendant was accused of embezzling money from her employer in numerous transactions over a period of 16 months, and the prosecutor aggregated those transactions to indict defendant on 16 counts of theft—one count for each month. Although the prosecutor's office did not have a "policy" for aggregating theft transactions, the prosecutor aggregated the transactions by month to create "a clear organizational outline for the jury." Defendant moved to dismiss the indictment, arguing that it violated Article I, section 20, because this court's decision in *State v. Freeland*, 295 Or 367, 375, 667 P2d 509 (1983), required the prosecutor to apply a "coherent, systematic policy" when aggregating theft transactions. The trial court denied that motion, and defendant entered a conditional guilty plea. On appeal, the Court of Appeals reversed, holding that the state had violated Article I, section 20, because the prosecutor's office had no policy providing consistent guidance for prosecutors regarding whether and how to aggregate multiple theft transactions. *State v. Savastano*, 243 Or App 584, 589-90, 260 P3d 529 (2011).[1] For the reasons set out below, we reverse the decision of the Court of Appeals and affirm defendant's conviction. In doing so, we overrule *Freeland* and reaffirm this court's decision in *State v. Clark*, 291 Or 231, 630 P2d 810, *cert den*, 454 US 1084 (1981).

## I.   FACTS AND PROCEEDINGS BELOW

Defendant was accused of embezzling more than $200,000 from her employer over a period of 16 months in numerous theft transactions. The prosecutor relied on an

---

[1] The state sought reconsideration to clarify the court's disposition of the case. The court clarified that it had not intended to dictate any particular remedy, and instead had intended to remand the case for further proceedings. *State v. Savastano*, 246 Or App 566, 568, 266 P3d 176 (2011).

aggregation statute to aggregate those theft transactions: "The value of single theft transactions may be added together if the thefts were committed * * * [a]gainst the same victim, or two or more persons who are joint owners, within a 180-day period." *Former* ORS 164.115(5) (2007), *renumbered as* ORS 164.115(6) (2011). The prosecutor aggregated the individual theft transactions by month and charged defendant with 16 counts of theft, including 10 counts of first-degree aggravated theft and six counts of first-degree theft.[2]

Defendant filed a motion to dismiss the indictment, arguing that her rights under Article I, section 20, of the Oregon Constitution[3] had been violated, because there was no "coherent, systematic policy" guiding the prosecutor's exercise of his discretion to aggregate multiple theft transactions. During the hearing on defendant's motion, the prosecutor explained how the aggregation decision had been made:

> "We don't have a policy for the way that these theft cases are aggregated. What we look at is a number of factors that are as unique as defendants are unique and as particular criminal acts are unique. * * * [I]n this particular case, as a side note, it was a decision based on clarity for a jury. It made a lot of sense. There are a number of acts in any of the—in every one of those months we're talking about. * * * We could have charged every, single one of those acts and we could have had an indictment with several hundred charges, I imagine. But what made sense in this particular case was to lump everything together by month and have a clear organizational outline for the jury when they're looking at the case."

The trial court denied defendant's motion, stating that the prosecutor was "well within [his] discretionary authority in charging the case in the way that [he] did." Defendant entered

---

[2] A person commits first-degree aggravated theft if "[t]he value of the property in a single or aggregate transaction is $10,000 or more." ORS 164.057. A person commits first-degree theft if "[t]he total value of the property in a single or aggregate transaction is * * * $750 or more." ORS 164.055(1)(a) (2007). ORS 164.055(1)(a) was amended in 2009, and, among other changes, the legislature increased the threshold value of property from $750 to $1000. Or Laws 2009, ch 16, § 3. We apply the 2007 version of the law here—as did the Court of Appeals—because defendant's theft transactions and the indictment occurred before the 2009 amendment.

[3] Article I, section 20, of the Oregon Constitution provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

a conditional guilty plea and appealed the trial court's denial of her motion.

The Court of Appeals reversed. The court began by reviewing this court's Article I, section 20, case law. The court noted that Article I, section 20, protects both individuals and classes of individuals. *Savastano*, 243 Or App at 588; *see also Clark*, 291 Or at 237 (noting that Article I, section 20, "forbids inequality of privileges or immunities not available 'upon the same terms,' first, to any citizen, and second, to any class of citizens"). This court's cases have analyzed separately individual-based claims—those focused on whether the government has granted or denied privileges or immunities "without legitimate reasons related to [a] person's individual situation"—and class-based claims—those focused on whether the government has granted or denied privileges or immunities to a class of citizens based on "unjustified differentiation." *Clark*, 291 Or at 239. Because defendant raised an individual-based claim, rather than a class-based claim, the Court of Appeals relied on the case law involving those claims and concluded that Article I, section 20, applies to prosecutorial discretion, including prosecutorial charging decisions. *Savastano*, 243 Or App at 588 (citing Oregon cases applying Article I, section 20, analysis to decisions of prosecutors). The court then set out a two-part test for analyzing individual-based claims under Article I, section 20, drawing, in part, from this court's decision in *Freeland*:

> "First, has a state actor made a decision that confers a privilege or imposes an immunity of constitutional magnitude? Second, if so, has the person claiming a constitutional violation shown that the decision did not result from the application of 'sufficiently consistent standards to represent a coherent, systematic policy[']?"

*Id*. (quoting *Freeland*, 295 Or at 375).[4]

---

[4] As we discuss below, the Court of Appeals did not read *Freeland* to require defendant to show that she had been treated less favorably than any other particular defendant, and she in fact made no such showing. Rather, the court appears to have concluded that it was sufficient for defendant to show that there were multiple ways in which the charges against her could have been aggregated, at least some of which would have been more favorable to her than the aggregation-by-month that the prosecutor used, *see* 243 Or App at 587 (noting that defendant could have been charged with as few as three counts or as many as one count for

Applying that two-part test, the Court of Appeals first concluded that the way in which multiple theft transactions are aggregated into a smaller number of criminal charges is of constitutional magnitude because of a defendant's possible burden to defend against "a multitude of minor charges" and because of the range of possible penalties that could accompany different charging decisions. *Id*. at 589. Addressing the second inquiry, the court determined that, although defendant did not provide evidence showing that a coherent, systematic policy was lacking in this case, the prosecutor conceded that the charging decision was unsystematic. *Id*. ("Although the prosecutor cited a criterion— clarity for the jury—he did not argue that the criterion was a department-wide or consistent policy[.]"). Moreover, although the prosecutor said that he considered a number of factors in making charging decisions, the court determined that that was not enough to satisfy the requirements in *Freeland*, because the "factors must remain constant from case to case." *Id*. Therefore, the court reversed and remanded the case to the trial court. *Id*. at 590.

## II. ISSUES ON REVIEW

On review, the state makes two arguments. The state first argues that application of the methodology set forth in *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), demonstrates that Article I, section 20, does not apply to prosecutors' charging decisions. Instead, the state argues, the text, history, and at least some of the case law surrounding that provision demonstrate that Article I, section 20, was intended to be a "narrow limitation on the legislature's authority to enact laws granting special privileges—largely economic privileges—to individuals or classes of individuals." The state reasons that, in this case, neither *former* ORS 164.115(5) (2007) nor any other statute at issue grants privileges or immunities. In advancing its interpretation of Article I, section 20, the state invites this

---

each of the alleged theft transactions), and that the prosecution's choice was not the result of a coherent, systematic policy. That analysis and result is consistent with *Freeland*, where the defendant was charged by what the court viewed as the permissible but less favorable grand jury indictment, although the prosecutor could have charged the defendant by means of the more favorable preliminary hearing procedure. 295 Or at 372-74.

court to reconsider and significantly narrow its prior analysis of both individual-based and class-based claims under Article I, section 20. To narrow that analysis, the state advocates overturning some of this court's prior cases, including *Clark* and *Freeland*.

Alternatively, the state argues, even if Article I, section 20, does apply to individual-based claims arising from a prosecutor's charging decisions, a prosecutor is not required to make those decisions according to a coherent, systematic policy. Rather, the prosecutor merely has to show that the decision was rational and was not based on impermissible criteria. Moreover, the state asserts, the prosecutor has to make that showing only after the defendant has demonstrated that he or she in fact was treated differently from similarly situated defendants.

Defendant responds that examination of Article I, section 20, using the *Priest* methodology reveals that that provision was intended to prevent the government from granting privileges or immunities in an inequitable or arbitrary way, which would include a prosecutor arbitrarily aggregating theft transactions. In addition to relying on the text and history of Article I, section 20, defendant traces this court's cases—including *Clark*, *Freeland*, and others—to support her argument that the prosecutor violated Article I, section 20, because he exercised his discretion to aggregate the theft transactions in the absence of any policy to guide that discretion. Defendant argues that the state has not met its burden of showing why this court should overturn its prior cases, including *Freeland*. Moreover, defendant argues, even if this court, considering the facts in *Freeland* anew, would have reached a different result, the rationale behind that decision remains sound.

At the outset, we note that the Court of Appeals was correct to apply *Freeland* in this case, because *Freeland* also involved an individual-based Article I, section 20, challenge to prosecutorial discretion involving charging decisions. Specifically, *Freeland* involved the prosecutor's discretion in determining whether to charge a defendant by indictment or by preliminary hearing. 295 Or at 372-73. Moreover, as discussed more fully below, although this court's application

of *Freeland* has not always been easy to square with the text of that opinion, the Court of Appeals relied on the standard articulated in *Freeland*. That is, after the court determined that a privilege or immunity was at issue, the court analyzed whether the prosecutor had applied "'sufficiently consistent standards to represent a coherent, systematic policy[.]'" *Savastano*, 243 Or App at 588 (quoting *Freeland*, 295 Or at 375).[5] Although defendant here did not identify anyone who had received more favorable treatment than she did, the court read *Freeland* to dispense with that requirement: "[U]nlawful discrimination occurs when the state distributes a benefit or burden in a standardless, ad hoc fashion, without any 'coherent, systematic policy.'" *Id.* (quoting *Freeland*, 295 Or at 375). Rather than requiring a showing of a similarly situated defendant who had been treated more favorably, the court held that a defendant could prevail if he or she could "establish[] the lack of criteria or, if there are criteria, the lack of consistent enforcement." *Id.* That reading of *Freeland* seems correct, as the defendant there did not identify any particular, similarly situated individual who was charged by means of a preliminary hearing rather than by grand jury indictment—although no one disputed that some defendants in Multnomah County were charged by the former procedure. It was sufficient in *Freeland* for the defendant to show that he might have received less favorable treatment than some other defendants, and that the prosecutor's choice to provide that less favorable treatment was not made pursuant to a coherent, systematic policy.

The Court of Appeals applied Article I, section 20, as interpreted in *Freeland*, and concluded that, because the prosecutor admitted that no policy for aggregating theft

---

[5] In undertaking the privilege or immunity analysis, the Court of Appeals reasoned,

"[T]he state's decision has obvious and serious consequences; depending on how the prosecution chooses to aggregate the theft transactions, defendant could have been burdened, or not, with the need to defend against a multitude of minor charges, and could have faced possible penalties of varying seriousness. *** [T]he privileges or immunities faced by defendant here are clearly of constitutional magnitude."

*Savastano*, 243 Or App at 588-89. We agree with the Court of Appeals that the privileges or immunities at issue in this case are of constitutional magnitude and therefore do not address that issue further.

transactions existed, and because he did not indicate that the criteria that he used in this case were consistently applied, defendant's Article I, section 20, rights were violated. *Id.* at 589-90. We cannot say that the Court of Appeals' application of *Freeland* was incorrect.

## III.   RECONSIDERATION OF *FREELAND*

That does not end our inquiry, however. Because defendant would prevail under *Freeland*, as the Court of Appeals concluded, we must next address the state's argument that application of the *Priest* methodology to Article I, section 20, demonstrates that *Freeland* should be overruled because Article I, section 20, does not require a prosecutor to apply a "coherent, systematic policy" to a charging decision like the one at issue here. Thus, we turn to examining the meaning of Article I, section 20, and specifically to whether it requires government entities to apply such a "policy" in granting a privilege or immunity.[6]

In undertaking the inquiry outlined in *Priest*, our goal is to identify the historical principles embodied in the text of Article I, section 20, and to apply those principles faithfully to modern circumstances as they arise. *Coast Range Conifers v. Board of Forestry*, 339 Or 136, 142, 117 P3d 990 (2005). Put differently, the historical inquiry set out in *Priest* invites us to identify the principles that Article I, section 20, was intended to advance, while recognizing that the scope of that provision is not limited to the historical circumstances surrounding its adoption. *See Hewitt v. SAIF*, 294 Or 33, 46, 653 P2d 970 (1982) (recognizing that Article I, section 20, extends protection to classes of citizens who were not protected when Oregon adopted its constitution in 1859).

---

[6] Although we reconsider *Freeland*, as requested by the state, we reject the state's argument that we should reconsider and "realign the entirety of the court's Article I, section 20, analysis with the intent of the framers." This case does not require us to reconsider the application of Article I, section 20, to claims of discrimination against classes of individuals. Moreover, as discussed later, we reject the state's suggestions that Article I, section 20, applies only to the enactment of laws and not to their implementation and that it applies only to economic privileges. For those reasons, we agree with several of the arguments set out in the brief of *amicus curiae* ACLU Foundation of Oregon, Inc., and find others unnecessary to address in this case.

A. *Text and History of Article I, Section 20*

We begin with the text of Article I, section 20, which provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

That section consists of an independent clause and a dependent clause. The independent clause is directed to the legislature. It provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities[.]" The dependent clause qualifies what would otherwise be an almost absolute prohibition on lawmaking, because lawmaking almost always involves or establishes some advantage or disadvantage for some group of citizens. The dependent clause permits laws granting privileges or immunities to any citizen or class of citizens as long as the privileges or immunities belong "equally" to all citizens "upon the same terms."

At first blush, the two clauses in Article I, section 20, appear antithetical. Read together, they prohibit a law granting a privilege or immunity to one citizen or a class of citizens unless the privilege or immunity is available to all citizens upon the same terms. As this court has recognized, the inclusion of the word "equally" resolves the tension between the two clauses and permits the legislature to draw classifications among citizens in granting privileges and immunities. Specifically, the court has recognized that requiring privileges or immunities to be granted "equally" permits the legislature to grant privileges or immunities to one citizen or class of citizens as long as similarly situated people are treated the same. *In re Oberg*, 21 Or 406, 410-11, 28 P 130 (1891). Accordingly, this court held in *Oberg* that a statute exempting sailors but no one else from arrest for debt did not run afoul of Article I, section 20, because it "prescribe[d] the same rule of exemption to all persons placed in the same circumstances." *Id*. at 408.[7] Thus, the text of

---

[7] In explaining why the legislature could conclude that other debtors were not similarly situated to sailors, the court offered three rationales. First, it explained that, at least on its face, the law was open ended: "[A]ny citizen desiring such immunity may have it in the words of the constitution, 'upon the same terms,' by becoming a sailor." *Oberg*, 21 Or at 408. Second, the court reasoned that, because different occupations may pose separate concerns, the legislature can enact laws

Article I, section 20, places a limit on the legislature's ability to draw classifications among citizens in enacting laws, but a requirement that the government apply a coherent, systematic policy—or any policy at all—in all decisions involving its citizens is not apparent from the text.

Similarly, the history of Article I, section 20, does not support a general requirement that the government must make decisions according to a "systematic policy." No record exists of any discussion of Article I, section 20, in the debates over the Oregon Constitution. *See* Claudia Burton and Andrew Grade, *A Legislative History of the Oregon Constitution of 1857 - Part I (Articles I & II)*, 37 Willamette L rev 469, 532-33 (2001). We know, however, that the provision was taken from the Indiana Constitution of 1851, *Clark*, 291 Or at 236, 236 n 7, and that it finds its roots in early colonial declarations of rights. *See* David Schuman, *The Right to "Equal Privileges and Immunities": A State's Version of "Equal Protection,"* 13 Vt L rev 221, 223 (1988) (tracing the history of equal privileges and immunities clauses). We also know that state constitutions drafted between 1840 and 1880 sought to address abuses that included "revealed fraud and corruption in public-land dealings and in the getting and granting of franchises, subsidies, and rate privileges for turnpikes, canals, river improvements, toll bridges, and, of course, especially railroads and street railways." James Willard Hurst, *The Growth of American Law: The Law Makers* 241-42 (1950).

The historical usage of the phrase "privileges, or immunities" points in the same direction. Before the revolution, one legal dictionary defined a "privilege" as consisting of four elements: "(1) a benefit or advantage; (2) conferred by positive law; (3) on a person or place; (4) contrary to what the rule would be in absence of the privilege." Robert G. Natelson, *The Original Meaning of the Privileges and Immunities Clause*, 43

---

that apply only to a single occupation without engaging in prohibited "class legislation." *Id*. at 409-10. The third rationale was a variation on the second. The court observed that, because the "object of the act *** was to aid and extend our foreign commerce by protecting sailors and preventing such burdens or exactions from being laid upon shipping as would discourage vessels from frequenting our ports," Article I, section 20, did not prevent the legislature from enacting an exemption for sailors that advanced only that legislative objective. *Id*. at 410.

Ga L rev 1117, 1130 (2009) (summarizing prerevolutionary legal dictionary definition). It also appears that

> "'immunity' and 'privilege' were reciprocal words for the same legal concept. Because an immunity was a benefit, other-wise contrary to law, given to a person or place by special grant, it was a privilege."

*Id*. at 1133-34; *accord Campbell v. Morris*, 3 H & McH 535, 553 (Md 1797) (explaining that the terms "[p]rivilege and immunity are synonymous, or nearly so").

In the period leading up to the Civil War, the phrase "privileges and immunities" ordinarily referred to state-created rights. *See* Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art*, 98 Geo LJ 1241, 1253, 1260-61 (2010).[8] A grant of privileges and immunities was not always viewed positively, however. During the Jacksonian era, newspaper editorials "commonly decried 'the possession of privileges or immunities, in which ninety-nine hundredths of the community, by the very nature of their situation, are denied all participation,' and they vilified the ' "privileged order" * * * on whom the law confers certain privileges or immunities not enjoyed by the great mass of the people.' " *Id*. at 1256-57 (quoting editorials) (ellipses in Lash; footnote omitted). Consistent with that concern, state constitutional privileges and immunities clauses drafted during and shortly after that period sought to prevent the government from granting benefits only to a favored few. *See id*. at 1257. Article I, section 20, was no exception to that trend. *See Clark*, 291 Or at 236 (explaining that the "language [of Article I, section 20,] reflects early egalitarian objections to favoritism and special privileges for a few").

The history reveals that, in borrowing Article I, section 20, from Indiana, the framers were acting in response

---

[8] In *Salem College & Academy, Inc. v. Emp. Div*., 298 Or 471, 488 n 13, 695 P2d 25 (1985), this court explained that the phrase "privileges, or immunities" in Article I, section 20, is not limited to the fundamental rights that Justice Washington identified in *Corfield v. Coryell*, 6 Fed Cas 546 (1823). More recently, commentators have questioned whether Justice Washington's identification of the fundamental rights protected by the federal Privileges and Immunities Clause is consistent with other cases from that period recognizing that the federal clause protects a limited set of state-created rights. *See* Lash, 98 Geo LJ at 1271 (summarizing discussion).

to legislative grants of privileges to a favored few. Viewed more abstractly, Article I, section 20, limited the criteria that government can use in granting privileges and immunities. It is difficult, however, to go beyond that and find in the history of that provision a requirement that executive agencies (or other branches of government, for that matter) standardize their decision making.

The state argues that Article VII (Original), section 17, of the Oregon Constitution provides additional historical context that clarifies how Article I, section 20, interacts with the role of prosecutors. Article VII (Original), section 17, creates the office of district attorney:

> "There shall be elected by districts comprised of one, or more counties, a sufficient number of prosecuting Attorneys, who shall be the law officers of the State, and of the counties within their respective districts, and shall perform such duties pertaining to the administration of Law, and general police as the Legislative Assembly may direct."

The state argues that prosecutors historically had discretionary authority regarding whether and how to bring charges and that attempts to limit that discretion did not emerge until well after the Oregon Constitution was adopted. Therefore, the state reasons, the framers intended prosecutors to have discretion that would not be limited by Article I, section 20. Defendant responds that the decision to create the office of district attorney in no way indicates an intent to exempt district attorneys from the requirements of Article I, section 20; in fact, defendant notes, the district attorneys' duties were to be set by the legislature, and even the state accepts that the legislature is subject to Article I, section 20.

The additional historical context of Article VII (Original), section 17, does not change the historical analysis of Article I, section 20. Similarly to Article I, section 20, Article VII (Original), section 17, does not indicate an intent to require consistency or policies in prosecutorial decisions; but neither does it indicate an intent for prosecutors to have unbridled discretion outside the bounds of Article I, section 20, particularly given the legislature's control over prosecutors' duties.

B.  *Early Cases Interpreting Article I, Section 20*

Having considered the text and history of Article I, section 20, we turn to this court's cases interpreting it. Most of this court's decisions have addressed challenges to legislative classifications.[9] As such, they did not address the issue raised here. We begin with five of this court's early decisions involving individual-based claims, which addressed either laws or executive decisions granting privileges or immunities to a single citizen. We then discuss *Clark* and *Freeland*. Finally, we discuss this court's decisions applying *Freeland*.

The first five decisions divide into two groups: One decision treated Article I, section 20, as a counterpart to constitutional provisions prohibiting special or local laws, *see Altschul v. State*, 72 Or 591, 596-97, 144 P 124 (1914), and the other four decisions addressed situations where the government had granted one person a monopoly. In *Altschul*, the legislature had granted one person (the plaintiff) the right to bring a suit against the state to determine his interest in land held by the state. *Id*. at 595. The state demurred to the plaintiff's suit on the ground that the statute authorizing that suit violated Article IV, section 24, which prohibits "special act[s]" permitting suits to be brought against the state; Article IV, section 23, which prohibits "special or local laws" in certain classes of cases; and Article I, section 20. The court held that the statute violated all three constitutional provisions. *Id*. at 596-97.

The court's analysis under Article I, section 20, consisted of a single sentence. It held that the statute "grant[ed] to the plaintiff [t]here a privilege which [was] not extended to any other person in the state, and hence [was] in conflict with Article I, section 20." *Id*. at 596. In grouping Article I,

_____

[9] For much of this court's history, it analyzed challenges to legislative classifications under Article I, section 20, and the Equal Protection Clause of the Fourteenth Amendment the same way. *See City of Klamath Falls v. Winters*, 289 Or 757, 769-70 n 10, 619 P2d 217 (1980), *appeal dismissed*, 451 US 964, 101 S Ct 2037, 68 L Ed 2d 343 (1981) (explaining that "[t]his court has consistently held that the scope of these two provisions is the same"). In *Clark*, the court interpreted Article I, section 20, independently from the federal constitution, while recognizing that "for most purposes analysis under Article I, section 20 and under the federal equal protection clause will coincide" in the result, if not the reasoning. 291 Or at 243.

section 20, with Article IV, sections 23 and 24, the court appears to have treated the prohibition against laws granting a privilege or immunity to "any citizen" as a species of constitutional provisions prohibiting special or local laws. *Cf.* Jeffrey M. Shaman, *Equality and Liberty in the Golden Age of State Constitutional Law* 31 (2008) (noting the relationship between privileges and immunities clauses and clauses prohibiting special or local laws). To the extent that *Altschul* holds that Article I, section 20, prohibits laws addressed to only a single person, that decision seems inapposite when applied to executive acts, which, by definition, often require acting only in individual cases.

As noted, the other four decisions addressed either statutes or agency decisions giving one person a monopoly. The first and most comprehensive of those decisions was *White v. Holman*, 44 Or 180, 74 P 933 (1904). In that case, the legislature had authorized a board to issue licenses to run sailors' boarding houses to "any person, firm, or corporation" that presented "satisfactory evidence * * * of the respectability and competency of such applicant, and of the suitableness of his or their accommodations, and of his or their compliance with all the provisions of this act." *Id*. at 182-83 (describing the statutory criteria for issuing licenses) (internal quotation marks omitted). The board, however, had not followed those statutory criteria in denying a license to the plaintiffs in *White*. *Id*. at 183. Rather, the board had denied the plaintiffs a license based on the wishes of shipping companies, which had directed the board "to limit the business to only one sailors' boarding house at Portland." *Id*. at 181-82.

The question, as this court framed it in *White*, was whether the board could grant a monopoly consistently with Article I, section 20.[10] In resolving that question, the court explained that a board charged with implementing a statute "can exercise no greater power than was possessed by the legislative assembly" in enacting it. *Id*. at 192. In holding that a board could not grant a license to only one applicant, the court concluded that the board had used a criterion that

---

[10] The court could have decided the case on the ground that the board had not followed the statutory criteria in denying the license. It did not take that course, however.

Article I, section 20, did not permit either the legislature or the board to use.

Specifically, the court started from the premise that "[t]he keeping of a sailors' boarding house is, in our opinion, a legitimate business, in the performance of which any citizen may engage as a matter of common right[.]" *Id.* at 191. It followed that the legislature could deny a license to run such a house only if it had a reasonable ground for doing so. *See id.* at 191-92. On that point, the court explained that the legislature could seek to deny licenses to persons who might take advantage of sailors' susceptibility to temptations once they reached shore. *See id.* at 189-91 (describing, at some length, the temptations to which sailors habitually fell prey while on shore). The board, however, had not based its decision to deny a license to the plaintiffs on that ground. Rather, the board arbitrarily had excluded what otherwise may have been qualified applicants from receiving a license based only on the wishes of the shipping industry. *Id.* at 192. Under Article I, section 20, this court held, neither the legislature nor the board could do that. *Id.*[11]

The other three decisions held that neither the legislature nor a board may grant an exclusive right to fish in one area of a navigable stream, because the right to fish in those waters is held in common by all citizens. *Monroe v. Withycombe*, 84 Or 328, 341, 165 P 227 (1917); *Eagle Cliff Fishing Co. v. McGowan,* 70 Or 1, 15, 137 P 766 (1914), *appeal dismissed*, 248 US 589, 39 S Ct 5, 63 L Ed 435 (1918); *Hume v. Rogue River Packing Co.*, 51 Or 237, 259, 92 P 1065 (1907). Citing *White* and Article I, section 20, the court reasoned in *Hume* that granting an exclusive right to fish was comparable to granting a monopoly, without any legitimate basis for giving only one person a right that the people held in common. 51 Or at 259-60. Following *Hume* and *Eagle Cliff Fishing*, the court reasoned in *Monroe* that, in light of the public's right to fish for salmon, neither the legislature nor the Fish Warden could "authorize only one person to fish for salmon for his own personal benefit and

---

[11] The court reasoned that, because the legislature "could not create a monopoly of a legitimate business in which every person can engage of common right, *a fortiori*, its creatures, the board, are likewise prohibited from doing so." *White*, 44 Or at 192.

private profit without any advantage to the public." 84 Or at 338, 341.

*White* and *Monroe* thus recognized that Article I, section 20, applies not only to the legislature but also to other branches of government. Both *White* and *Monroe* also made clear that, under Article I, section 20, the same limitations that apply to the legislature in enacting laws apply to other government entities when they take action in an individual case. That is, the government may not use a classification or criterion to decide an individual case that the legislature could not use in enacting a law. Neither *White* nor *Monroe* went beyond that, however. None of the early decisions interpreting Article I, section 20, held or suggested that that section requires systematic consistency in government decision making, which is the lynchpin of the Court of Appeals decision, applying *Freeland*, in this case. *Savastano*, 243 Or App at 590 ("We require only consistent, systematic criteria, and that those criteria be permissible.").

One other case deserves discussion because it is sometimes cited as precedent for the individual branch of Article I, section 20, analysis. In *State of Oregon v. Cory*, 204 Or 235, 237, 282 P2d 1054 (1955), the defendant challenged a statute that authorized increased punishment for persons convicted of two or more felonies within five years. *See* Or Laws 1947, ch 585, §§ 1, 2. As amended in 1951, the statute provided that, if, within two years of a defendant's conviction, the prosecutor learned that the defendant previously had been convicted of a nonviolent felony, the prosecutor "'may, immediately file an information accusing the person of the previous convictions.'" *See Cory*, 204 Or at 237-38 (quoting the amended statute).

The defendant in *Cory* focused on the phrase "may *** file." He argued that giving a prosecutor discretion to charge him as an habitual offender violated "the Equal Protection Clauses of the state and federal constitutions." *Id*. at 237. Relying on an earlier case that had been decided on the basis of the federal Equal Protection Clause, the court held that the statute "giv[ing] the district attorney unlimited authority to proceed or not to proceed at all against a convicted

felon in personal, nonviolent cases * * * [was] unconstitutional." *Id*. at 239-40.

 *Cory*'s precedential value for interpreting Article I, section 20, is limited. Although the court mentioned "the Equal Protection Clauses of the state and federal constitutions," *id*. at 237, it undertook no independent analysis of Article I, section 20. Rather, it relied on the decision issued one month earlier in *State of Oregon v. Pirkey*, 203 Or 697, 281 P2d 698 (1955), which had described the two constitutional provisions as "similar limitations upon legislative action" and which had relied almost exclusively on federal equal protection decisions in holding another statute unconstitutional. *See id*. at 703-04. *Cory*'s persuasive value also is suspect. The statute providing that prosecutors "may * * * file" an information, which the court held unconstitutional in *Cory*, is difficult to distinguish from the discretion that prosecutors customarily enjoy to file or not file charges. Not only would *Cory*'s reasoning, taken to its logical conclusion, render all prosecutorial discretion to bring or not bring criminal charges unconstitutional, but the United States Supreme Court unanimously has rejected the federal equal protection theory on which both *Pirkey* and *Cory* rested. *See United States v. Batchelder*, 442 US 114, 124-25, 99 S Ct 2198, 60 L Ed 2d 755 (1979).

## C. Clark *and* Freeland

 Having considered the primary cases involving the individual branch of Article I, section 20, that preceded *Clark* and *Freeland*, we turn to those decisions. In *Clark*, the defendant raised two separate Article I, section 20, challenges. He argued initially that the prosecutor had denied him a privilege afforded other defendants, because the prosecutor had charged him by indictment rather than by means of a preliminary hearing. The defendant argued that the state had violated his Article I, section 20, rights because both procedures were available, one of them (the preliminary hearing) was a "privilege" of constitutional magnitude, and the state had denied him that privilege. The defendant contended that he was not required to show that any similarly situated defendant had been given a preliminary hearing. Alternatively, he argued that the prosecutor had violated

Article I, section 20, when he granted immunity to two of his potential codefendants but not to him.

In resolving the defendant's arguments, the court explained that Article I, section 20, is "a guarantee against unjustified denial of equal privileges or immunities to individual citizens at least as much as against unjustified differentiation among classes of citizens." *Clark*, 291 Or at 239. Regarding the denial of equal privileges or immunities to an individual citizen, the court explained that Article I, section 20, calls for an "analysis whether the government has made or applied a law so as to grant or deny privileges or immunities to an individual person without legitimate reasons related to that person's individual situation." *Id*. In stating the applicable standard in *Clark*, the court focused on the legitimacy of the government's reasons in an individual case; that is, *Clark* explained that an executive decision granting or denying a person privileges or immunities "without legitimate reasons related to that person's individual situation" would be an "unjustified denial of equal privileges or immunities to [an] individual citizen[]." *Id*.

Applying that standard, the court rejected the defendant's first argument—that the mere existence of discretion to charge a defendant by means of a preliminary hearing or an indictment violated Article I, section 20. On that issue, the court held:

> "Without a showing that the administration of [those two charging procedures] in fact denied [the] defendant individually, or a class to which he belongs, the equal privilege of a preliminary hearing with other citizens of the state similarly situated, the circuit court did not err in denying the motion to dismiss the indictment."

*Id*. at 243. Because the defendant had made no such showing regarding the prosecutor's decision to proceed by indictment, the court had no need to decide—and did not decide—when the "administration" of those procedures would violate the state equal privileges or immunities clause. That is, because the defendant had not shown that he was denied "the equal privilege of a preliminary hearing with other citizens of the state similarly situated," the court did not further examine

the prosecutor's decision to proceed by indictment. *Id*.; *see also id*. at 242 (rejecting the conclusion that the difference between "two available procedures necessarily represents a denial of equal protection of the laws, regardless of showing which defendants receive one or the other procedure").

In contrast, the court did review the merits of the defendant's immunity argument because the defendant had shown that he in fact was treated differently from his potential codefendants. As noted, the defendant argued that the prosecutor's decision to grant immunity to two of his potential codefendants but not to him violated Article I, section 20. Specifically, he contended that Article I, section 20, prohibited the prosecutor from exercising discretion without previously stated standards. The court disagreed, explaining that a prosecutor would comply with Article I, section 20, "as long as no discriminatory practice or illegitimate motive is shown and the use of discretion has a defensible explanation." *Id*. at 246. On that issue, the prosecutor explained that he had treated the defendant differently from his potential codefendants because the defendant had been the instigator of the crime, and the court held that the prosecutor's explanation satisfied Article I, section 20. *Id*. Not only had the defendant failed to show a discriminatory practice or motive, but the reason that the prosecutor gave was "defensible." *Id*.

To be sure, *Clark* recognized that an individual citizen can argue under Article I, section 20, that the prosecutor either acted for a discriminatory or illegitimate motive or had no "defensible explanation" for his or her action. But defendant here does not argue that the prosecutor aggregated the theft transactions based on a discriminatory or illegitimate motive, and the Court of Appeals did not base its decision on the prosecutor's failure to provide an explanation as "defensible" as the one provided in *Clark*. In fact, the Court of Appeals noted that the prosecutor cited the criterion of jury clarity, and the court did not indicate that the use of that criterion was impermissible under *Clark*; however, in this case, the Court of Appeals went on to note that the prosecutor "did not argue that the criterion was a department-wide or consistent policy." *Savastano*, 243 Or App at 589. Thus, the Court of Appeals' decision was not

grounded in the interpretation of Article I, section 20, set forth in *Clark*.

Instead, the Court of Appeals in this case applied the interpretation of Article I, section 20, in *Freeland*, and we turn to that case. In *Freeland*, as in *Clark*, the defendant was indicted by a grand jury and denied a preliminary hearing. In contrast with the defendant in *Clark*, however, who had made no showing regarding the district attorney's practice in submitting cases to the grand jury rather than having a preliminary hearing, the defendant in *Freeland* adduced testimony from the district attorney and a deputy district attorney regarding the factors they considered in making those decisions. Those individuals testified that the district attorney's office had a written policy that, in cases of rape or sexual assault and in cases involving youthful victims, the prosecution generally would avoid preliminary hearings in deference to the victims. *Freeland*, 295 Or at 379. In other cases, the decision was entrusted to the deputy district attorney assigned to the case, who would apply various criteria, including whether the defendant was in custody, whether the crime was a property crime or a person crime, the complexity of the case, the amount of judicial time required for a preliminary hearing, the availability of witnesses, and many other factors. *See id.* at 379-80; *see also State v. Freeland*, 58 Or App 163, 166-69, 647 P2d 966 (1982) (both summarizing testimony). Both the district attorney and the deputy district attorney assigned to the case testified that "the treatment of [the] defendant's case was no different from that of any other similar case." *Freeland*, 58 Or App at 168-69.

The trial court applied what it stated was its "understand[ing]" of *Clark* and *State v. Edmonson*, 291 Or 251, 630 P2d 822 (1981),[12] concluding that, in Multnomah County, the

_____

[12] *State v. Edmonson*, 291 Or 251, 630 P2d 822 (1981) was a brief opinion issued the same day as *Clark* in which this court followed *Clark* and rejected a defendant's claim that "the simple coexistence" of the grand jury and preliminary hearing procedures violated Article I, section 20. 291 Or at 253. As in *Clark*, the court stated that the defendant had failed to show how the administration of the choice of procedure denied him, as an individual or a class member, any privilege or immunity. *Id.* at 253-54. The case contains no legal analysis of the equal privileges or immunities provision beyond that in *Clark*, but does use different phrasing than *Clark* in requiring that government actions must "uniformly rest on meaningful criteria" that make the benefit equally available to all similarly situated people and

choice between proceeding by indictment or preliminary hearing did not """uniformly rest on meaningful criteria thatindeed make the privileges of a preliminary hearing equally available to all persons similarly situated."'" *Freeland*, 295 Or at 381 (quoting trial court opinion (quoting *Edmonson*, 291 Or at 254)). The trial court explained that, because the decision was made at the discretion of the prosecutor and based, at least in part, on "logistical" and "tactical" criteria, the "'choice of procedure is administered "purely haphazardly or otherwise on terms that have no satisfactory explanation"'" under Article I, section 20. *Id.* (quoting trial court opinion (quoting *Edmonson*, 291 Or at 254)).

The Court of Appeals reversed, noting that although *Clark* and *Edmonson* were susceptible of different readings, in its view those decisions did not "require clearly delineated categories" that would determine the choice of indictment or preliminary hearing in every case. *Freeland*, 58 Or App at 171. The Court of Appeals observed that the criteria described at trial "[did] not, on their face, classify or treat persons differently on the basis of personal characteristics or as members of a disfavored minority or, for that matter, any impermissible class." *Id.* at 172. Indeed, based on the record, the court concluded, "Defendant ha[d] not shown that he was treated differently from other defendants similarly situated (at least in Multnomah County) * * *." *Id.*

On review, this court reversed the Court of Appeals. The court recognized that the case called for "a further analysis" of Article I, section 20, than the court had undertaken in *Clark*. *Freeland*, 295 Or at 372. In *Freeland*, the defendant did not argue, as the defendant in *Clark* had, that the existence of discretion to charge a defendant by indictment or preliminary hearing was sufficient, without more, to violate Article I, section 20. Rather, he "challenge[d] * * * the terms upon which the prosecution based its refusal of a preliminary hearing to [him]." *Id.* This court allowed review "to address the issues of administering preliminary hearings 'upon the same terms' for similarly situated defendants" that

---

prohibiting privileges that are administered "purely haphazardly or otherwise on terms that have no satisfactory explanation" under Article I, section 20. *Id.* The trial court in *Freeland* relied on those statements, as did this court in affirming the trial court. *Freeland*, 295 Or at 381.

it had not been able to reach in its earlier cases. *Id*. at 369. The court thus confronted the defendant's challenge to the prosecutor's administration of the two different charging procedures.

In resolving that challenge, the court focused on whether, in the absence of prior rulemaking, the individual decisions made by the district attorney's office reflected a sufficiently consistent pattern or policy to satisfy Article I, section 20. Relying on *Clark* and *Edmonson*, the court held that Article I, section 20, prohibits "'[h]aphazard' or standardless administration, in which the procedure is chosen *ad hoc* without striving for consistency among similar cases." *Id*. at 374. The question, the court stated, was whether the prosecutor's decision of which charging procedure to use "adhere[d] to sufficiently consistent standards to represent a *coherent, systematic policy*, even when not promulgated in the form of rules or guidelines." *Id*. at 375 (emphasis added).[13] Although the defendant did not complain of discrimination against him because of any personal characteristic and did not identify any particular person similarly situated to him who was given a preliminary hearing when he was not, this court nevertheless held that the case

> "[fell] within the principle that equal treatment may not be denied 'haphazardly' by *ad hoc* decisions that *** do not 'uniformly rest on meaningful criteria that indeed make the privileges of a preliminary hearing equally available to all persons similarly situated, or, in the constitutional phrase, "upon the same terms."'"

*Id*. at 381 (quoting *Edmonson*, 291 Or at 254 (quoting Article I, section 20)).[14]

---

[13] The court also observed that some criteria for making the procedural decision—even apart from discrimination for or against an identifiable social group—may be "valid" or "permissible," and other criteria may not be. *Freeland*, 295 Or at 373 (identifying "permissible" criteria); *id*. at 375 (considering whether reasons for using one procedure rather than another would be "valid"). And some aspects of the court's opinion suggest that certain of the considerations identified by the district attorney's office may not be permissible criteria. *Id*. at 381-82 (questioning reliance on, among other things, insufficient time to complete a preliminary hearing). However, the unambiguous holding of *Freeland*, as discussed in the text, is that the potential for haphazard and inconsistent application of the criteria is sufficient to constitute an Article I, section 20, violation.

[14] Justice Jones dissented, arguing, *inter alia*, that the defendant had failed to show that the prosecutor's decision to proceed by indictment was based on some

Elsewhere in the opinion, the court appeared to respond to the state's argument—and the testimony from the district attorney's office—that the defendant had failed to show that he was denied a privilege that a similarly situated person had been granted. Rather than requiring a showing of unequal treatment, the court seemed instead to take the position that, in the absence of a "coherent, systematic policy"—and given the wide range of factors identified by the district attorney's office as relevant to the decision—the risk of unequal treatment was sufficient to violate Article I, section 20. For example, the court stated that, unless "sufficiently consistent standards" are applied, the "administration of the system 'upon the same terms' toward similarly situated defendants cannot be assured." *Id*. at 375. Similarly, in describing the potential for treating similarly situated defendants differently because of the myriad criteria identified by the district attorney's office, the court observed that one person accused of participating in a robbery "might" be afforded a preliminary hearing and another, under identical circumstances, "might" be denied one because the assigned deputy district attorney did not wish to subject his witnesses to cross-examination. *Id*. at 381. Again, in the court's view, the requirement of consistently applied standards would prevent that potential problem. Thus, the "coherent, systematic policy" test announced by the court apparently was intended as a prophylactic rule to prevent the possibility of differential treatment of similarly situated persons.

Applying the standard that it had articulated, this court in *Freeland* concluded that the district attorney's decision to proceed against the defendant by way of indictment, rather than preliminary hearing, violated Article I, section 20, and it affirmed the trial court's dismissal of the indictment. *Id.* at 381, 384.

D.  *The Post*-Freeland *Cases*

*Freeland* was the first case to hold that Article I, section 20, requires, in addition to the use of permissible

---

"discriminatory motive" or "other arbitrary classification" or that he "was singled out, not dealt with on substantially the 'same terms' as others similarly situated or was the victim of a 'haphazardly' arrived at ad hoc decision." *Freeland*, 295 Or at 394-96 (Jones, J., dissenting).

criteria, evidence of a policy that standardizes an agency's exercise of its discretion. Since *Freeland*, this court has reiterated the latter requirement, but it has never found that any government agency has violated it. *See, e.g.*, *City of Salem v. Bruner*, 299 Or 262, 270-71, 702 P2d 70 (1985).[15] Indeed, no decision since *Freeland*—other than the Court of Appeals decision in this case—has held that government action in providing a burden or a benefit to a particular individual violated Article I, section 20, because it was made in a "standardless, ad hoc fashion, without any 'coherent, systematic policy.'" *Savastano*, 243 Or App at 588 (stating that test and quoting *Freeland*). Moreover, this court's post-*Freeland* decisions involving prosecutorial discretion and Article I, section 20, are not always easy to reconcile with the reasoning in *Freeland*. We turn to a consideration of several of those cases.

In *State v. Farrar*, 309 Or 132, 786 P2d 161, *cert den*, 498 US 879 (1990), a death penalty case, the defendant argued that the district attorney's office had refused to enter into plea negotiations with him on the same terms that it had entered into plea negotiations with other persons charged with aggravated murder. 309 Or at 138-42. The defendant observed that, in three aggravated murder cases, the district attorney had considered a shifting mix of factors, that not all the same factors applied in each case, and that even when the same factors applied the district attorney had sometimes given them different weight. *See id*. at 139-40.[16] This court rejected the defendant's Article I, section

---

[15] In *Bruner*, for example, the court reiterated the reasoning in *Freeland* and stated that a government decision to charge a defendant in one, rather than the other, of two different courts, each of which had a different appeals procedure, "present[ed] a choice of 'privileges' which must be made by defensible criteria, that is, by criteria which ensure consistency in treatment." 299 Or at 270. The court's holding was more limited, however. The defendant in *Bruner* had argued only that an officer's discretion to charge him into municipal or circuit court, with the resulting selection of different routes of appellate review, was sufficient by itself to establish a violation of Article I, section 20, and the court rested its holding on the more limited ground that, as in *Clark*, the existence of discretion to proceed in one of two ways, standing alone, did not give rise to an equal privileges or immunities violation. *Id*. at 271. Not only was the preceding discussion of *Freeland* unnecessary to the court's holding and thus dicta, but it also imposed a requirement of "ensur[ing] consistency" in addition to "defensible criteria," *id*. at 270, which was absent in *Clark*.

[16] Among other things, the district attorney considered the defendant's age, prior record, mitigating evidence, and the strength of the proof in deciding whether

20, challenge, reasoning that in each case the factors that the district attorney considered "had a rational relation to the prosecutorial decision" whether to engage in plea negotiations and that the district attorney's decision in each case "was reasonable under the circumstances." *Id*. at 141. The court concluded that the district attorney had offered a "clear, rational, consistent, and consequently sufficient justification for treating [the] defendant differently from [the other two persons charged with aggravated murder]." *Id*.

Implicit in *Farrar* was the recognition that many decisions that prosecutors and other executive officials make involve multiple variables. Not all decisions involve the same variables, the variables in each case may cut in different directions, and the priority or weight that each variable deserves may differ from one case to the next. Although a prosecutor's different treatment of similarly situated persons may not be "merely 'haphazard,' *i.e.*, without any attempt to strive for consistency among similar cases," *id*. at 140, it need only be "rational and consistent." *Id*. at 141. Instead of the "coherent, systematic policy" test of *Freeland*, this court in *Farrar* applied a less rigorous standard that focused on rational, reasonable, and consistent decisions.

A second decision, *State v. Buchholz*, 309 Or 442, 788 P2d 998 (1990), looks in the same direction. In that case, the prosecutor did not offer a plea agreement to the defendant but did offer a plea agreement to a codefendant. 309 Or at 446-47. In response to the defendant's argument that the district attorney's office lacked a coherent, systematic policy for offering plea bargains, this court noted that ORS 135.415 specified the criteria for offering a plea bargain and reasoned that those statutory criteria provided "consistent standards representing a coherent, systematic policy" regarding plea agreements. *Id*. at 445, 447 (citing ORS 135.415).

Similarly to *Farrar*, the court's reasoning in *Buchholz* is not easy to square with *Freeland*. The statute on which the court relied in *Buchholz* listed multiple criteria that "may

---

to enter into plea negotiations. *Farrar*, 309 Or at 139. In concluding that those considerations were permissible, the court reasoned that the "district attorney's actions were not based on class discrimination, animus to [the] defendant or his attorney, or on concerns collateral to fair prosecution of [the] defendant for aggravated murder." *Id*. at 140-41.

be take[n] into account," permitting a prosecutor to apply one criterion in one case and another criterion in a different case, which could lead to different results being reached in similar cases. Beyond that, the statute did not limit the criteria (or "considerations," as the statute called them) that a prosecutor could take into account; it explicitly recognized that prosecutors could take into account additional, unspecified considerations in deciding whether to offer a plea bargain. *See* ORS 135.415 (providing that a prosecutor "may take into account, but is not limited to, any of the following [six] considerations"); *cf.* [*Schmidt v. Mt. Angel Abbey*](#), 347 Or 389, 409, 223 P3d 399 (2009) (Walters, J., concurring) (explaining that "the phrase 'including but not limited to,' followed by a list of examples, [often] conveys an intent to illustrate or to broaden, rather than to limit the meaning of a general term"). Finally, the statute provided no guidance as to how a prosecutor should weigh or prioritize those considerations when the decision whether to offer a plea agreement turned on multiple conflicting considerations.

If a coherent, systematic policy that guides agency decision making is a constitutional requirement, the nonexclusive list of statutory considerations in ORS 135.415 did little to advance it. Despite those problems, the court in *Buchholz* cited *Freeland* and held that the existence of those statutory considerations, without more, represented a coherent, systematic policy that satisfied Article I, section 20.[17] It is difficult to reconcile *Buchholz* with the reasoning in *Freeland*, which envisioned either prior rulemaking that standardized prosecutorial discretion or the ability to identify a consistent practice retrospectively. *See Freeland*, 295 Or at 378 (noting that either "internal rules or guidelines" or "consistency in practice" could satisfy Article I, section 20, requirements). In our view, *Buchholz* is best understood as standing for the proposition that Article I, section 20, requires that the considerations that a prosecutor takes into account in an individual

---

[17] The defendant in *Buchholz* did not argue that the standards in ORS 135.415, standing alone, were not consistent standards representing a coherent, systematic policy, and instead challenged the application of those standards. 309 Or at 447. Nonetheless, the court stated that the prosecutor's application of one of the criteria in the statute to the two codefendants, without further explanation regarding his practice in other cases, was sufficient to satisfy the requirement in *Freeland* of a "coherent, systematic policy." *Id*.

case have "a rational relation to the \*\*\* decision" and that the decision in each case be "reasonable under the circumstances." *See Farrar*, 309 Or at 141.

This court again rejected a claim that a prosecutor improperly had refused to consider a plea offer in another death penalty case, *State v. McDonnell*, 313 Or 478, 492, 837 P2d 941 (1992). The prosecutor testified that because the facts of the defendant's case fit one of the aggravated murder categories and were "strong," he charged the defendant with aggravated murder and thereafter refused to plea bargain. *Id*. at 490. He also analyzed the case in terms of the nonexclusive factors identified in ORS 135.415, which were held in *Buchholz* to meet the requirements of Article I, section 20. *Id*. at 492. The parties disputed whether the prosecutor's conduct demonstrated a "systematic policy" concerning plea bargaining aggravated murder cases. This court concluded that "the decision not to plea bargain in aggravated murder cases was based on rational and proper grounds \*\*\*." *Id*. at 491. Although the court quoted the "coherent, systematic policy" language from *Freeland* and found that the prosecutor's conduct met that standard, it also quoted and followed the arguably looser standard of *Farrar* and *Buchholz*, which upheld decisions on plea bargains that were consistent with ORS 135.415 and were "reasonable" and "rational." *See McDonnell*, 313 Or at 490-92 (citing and quoting *Farrar* and *Buchholz*).

E.   *The State's Arguments Regarding Article I, Section 20*

With that background in mind, we turn to the state's argument that Article I, section 20, applies only to the legislature and only to economic benefits. That argument sweeps too broadly. For over 100 years, this court has recognized that Article I, section 20, applies not only to the legislature but also to other branches of government. *See, e.g.*, *Clark*, 291 Or at 239 (detailing application of Article I, section 20, to "administration of laws under delegated authority" and prosecutorial discretion); *White*, 44 Or at 192 ("[T]he board of commissioners for licensing sailors' boarding houses can exercise no greater power than was possessed by the legislative assembly[.]"). Indeed, in *State v. Stevens*, 311 Or 119, 125, 806 P2d 92 (1991), the court assumed that Article I,

section 20, applies to the judicial branch, but held that no violation had been shown.

In applying Article I, section 20, moreover, this court has similarly recognized that "privileges, or immunities," are not limited to economic benefits. *See, e.g.*, *Clark*, 291 Or at 241 ("There is no question that the opportunity of a preliminary hearing is a 'privilege' within the meaning of the constitutional guarantee[.]"); *State v. Reynolds*, 289 Or 533, 541, 614 P2d 1158 (1980) (applying Article I, section 20, to prosecutor's charging decision). The state is correct that many early privileges or immunities cases involved monopolies or other economic benefits, but nothing in the words of the provision or the historical definitions of those words indicates that they do not also apply to noneconomic privileges or immunities conferred by the government.

We accordingly disagree with the state's argument that Article I, section 20, places no limitation on the decision that the prosecutor made. We conclude, as the court did in *White*, that Article I, section 20, places the same limitation on other branches of government that it places on the legislature: An executive agency cannot use a criterion in acting in an individual case that the legislature cannot use in enacting a law. *See White*, 44 Or at 192. That same limitation applies even if no economic benefit is involved. *See Clark*, 291 Or at 241.

We recognize, however, as the state argues, that *Freeland* goes beyond *White* and *Clark* and imposes the additional requirement of a consistently applied "coherent, systematic policy" to guide every instance of agency decision making. The parties' competing positions require us to decide whether, in grounding that requirement in Article I, section 20, the decision in *Freeland* went beyond the text of Article I, section 20, its history, and the cases interpreting it.

In considering that question, we note that *Freeland* stands alone. No case that preceded *Freeland* announced the requirement of a "coherent, systematic policy" that *Freeland* drew from Article I, section 20. Similarly, although a number

of cases coming after *Freeland* have cited that standard, no case decided after *Freeland* has held that an executive agency (or the legislature or judiciary) violated the requirement that the court recognized in *Freeland*, and the reasoning in those cases is sometimes difficult to square with *Freeland*'s. As explained above, *Farrar* and *Buchholz* did not require a "coherent, systematic policy," as *Freeland* did, for the court to conclude that an official's decision to treat one person differently from another in an individual case was "defensible." *See Clark*, 291 Or at 246. Similarly, in *McDonnell*, the court cited the "coherent, systematic policy" standard, but also held that the prosecutor's refusal to plea bargain was consistent with Article I, section 20, because it was "based on rational and proper grounds" and was consistent with nonexclusive factors set out in statute. 313 Or at 491-92.

Not only does *Freeland* appear to go further, by requiring a coherent and systematic policy, than the cases that both preceded and followed it, but the support it identified for the conclusion that it reached is not immune from question. As noted, the court recognized in *Freeland* that the issue before it required "further analysis" than the court undertook in *Clark*, but it appeared to treat the holding that it reached as if it were a foregone conclusion from the decision in *Clark*. The holding in *Clark* is narrow, however. The court neither considered nor decided in *Clark* the issue that it later resolved in *Freeland*, and it is difficult to find support in *Clark*'s holding for the conclusion that *Freeland* reached. Moreover, the standards that the court announced in *Clark* can (and we think should) be read consistently with this court's earlier decisions: A prosecutor may not use criteria in administering charging procedures that the legislature could not use in enacting laws. As the court explained in *Clark*, in making an individual decision, a prosecutor will comply with Article I, section 20, "as long as no discriminatory practice or illegitimate motive is shown and the use of discretion has a defensible explanation." 291 Or at 246.

We acknowledge that some of the statements in *Clark*—and in *Edmonson*, which relied upon and paraphrased

*Clark*—can be read more broadly, and that is how the court interpreted them in *Freeland*. However, in doing so, the court in *Freeland* read more into those statements than was warranted by the issue that *Clark* resolved, and the court's reading of those statements went beyond the text, history, and other cases interpreting Article I, section 20. *Freeland* adopted a broad prophylactic rule that might well further the rights protected by Article I, section 20, and protect against their violation. In our view, however, that rule is not required by Article I, section 20.

Finally, we note that, in explaining why requiring consistency in agency decision making was compatible with prosecutorial discretion, the court in *Freeland* discussed at some length administrative law decisions and quoted from an article reasoning that administrative law principles should be applied to prosecutorial decision making. *See Freeland*, 295 Or at 376-78. To the extent that the court viewed Article I, section 20, as requiring the consistent, systematic policies characteristic of administrative regulatory schemes, we think it went farther than the text of that provision, its history, and the cases interpreting it warrant. We do not disagree with some of the statements in *Freeland* (and the commentators and administrative law principles discussed there) about the value of policies to guide prosecutorial discretion and limit the potential for discriminatory enforcement or different treatment of similarly situated persons. And the articles, studies, and guidelines cited in *Freeland* provide models for improving the prosecutorial function and the administration of justice that might profitably be adopted by policy or statute. For the reasons discussed, however, we conclude that the failure to adopt or adhere to such policies does not violate Article I, section 20.

We also reject the related notion in *Freeland* that a defendant can satisfy his or her initial burden in bringing an individual-based claim under Article I, section 20, merely by showing that the government lacks a coherent, systematic policy. Without any showing by the defendant that he was denied a privilege or immunity that was granted to a similarly situated person, the court required the state to show a "coherent, systematic policy" and the absence of "haphazard"

administration.[18] Those requirements, the court said, would "assure[]" equal treatment and prevent inconsistent application of the policy that "might" otherwise occur. *Freeland*, 295 Or at 375, 381. *Freeland*, in effect, relieved the defendant of the burden of demonstrating a *prima facie* violation of Article I, section 20, by showing that he or she was treated differently than a similarly situation person, and instead required the state to prove that it had adopted and uniformly applied policies that would prevent such violations. *Cf.* Wayne R. LaFave *et al.*, 4 *Criminal Procedure* § 13.4(b), 172 (3d ed 2007) (defendant bears burden of demonstrating selective or discriminatory enforcement); *see also Freeland*, 295 Or at 397 (Jones, J., dissenting) (defendant bears burden of making *prima facie* showing of differential treatment). *Freeland* did not identify any constitutional or statutory basis for imposing that obligation on the state—in the absence of any showing by the defendant of discrimination or the use of improper criteria—and we are aware of none.

This court explained in *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 53, 11 P3d 228 (2000), that

> "[t]he question [whether to overrule a prior constitutional decision] is one of *stare decisis*, a doctrine that attempts to balance two competing considerations. On one hand is the undeniable importance of stability in legal rules and decisions. That consideration applies with particular force in the arena of constitutional rights and responsibilities, because the Oregon Constitution is the fundamental document of this state and, as such, should be stable and reliable. On the other hand, the law has a similarly important need to be able to correct past errors. This court is the body with the ultimate responsibility for construing our constitution, and, if we err, no other reviewing body can remedy that error. *See Hungerford v. Portland Sanitarium*, 235 Or 412, 415, 384 P2d 1009 (1963) ('[t]he pull of *stare decisis* is strong, but it is not inexorable')."

We do not lightly decide to overrule an earlier constitutional decision. *See Farmers Ins. Co. v. Mowry*, 350 Or 686, 693-94, 261 P3d 1 (2011) (reviewing the considerations that will

---

[18] The dissent in *Freeland* also made this point, noting that it had found no other judicial decision that placed the burden on prosecutors to make such a showing. 295 Or at 394-95 (Jones, J., dissenting).

warrant overruling an earlier constitutional precedent). In our view, however, application of the court's methodology in *Priest* for interpreting constitutional provisions persuades us that *Freeland* went beyond the cases that preceded it, and *Freeland*'s holding finds little support in the text or history of Article I, section 20. Moreover, the cases that have followed *Freeland* have eroded its precedential value and effectively returned to the more limited and historically grounded principle stated in *Clark*.

In these circumstances, we conclude that it is appropriate to overrule the decision in *Freeland* and reaffirm the decision in *Clark*. To bring an individual-based claim under Article I, section 20, a defendant must initially show that the government "in fact denied defendant individually *** [an] equal privilege *** with other citizens of the state similarly situated." *Clark*, 291 Or at 243. An agency or official's decision will comply with Article I, section 20, "as long as no discriminatory practice or illegitimate motive is shown and the use of discretion has a defensible explanation" in the individual case. *Id*. at 246. An executive official's decision will be "defensible" when there is a rational explanation for the differential treatment that is reasonably related to the official's task or to the person's individual situation. *See id*. at 239, 246.

To summarize, the *Priest* analysis—and particularly this court's long history of cases interpreting Article I, section 20—confirms the conclusion that that provision applies to government actions generally, including prosecutors making charging decisions. Article I, section 20, does not require consistent adherence to a set of standards or a coherent, systematic policy, as defendant contends; that provision does, however, require government to treat similarly situated people the same. A government decision-maker will be in compliance with Article I, section 20, as long as there is a rational explanation for the differential treatment that is reasonably related to his or her official task or to the person's individual situation.

## IV.   APPLICATION OF ARTICLE I, SECTION 20

We return to the facts of this case, viewed in light of this court's interpretation of Article I, section 20, in *Clark*.

The prosecutor aggregated the theft transactions into 16 counts of theft, organizing the charges by month to provide clarity for the jury. Defendant does not challenge the prosecutor's aggregation of the theft transactions on grounds that the prosecutor engaged in a discriminatory practice or based his decision on impermissible criteria, such as race or gender. Nor does defendant challenge the prosecutor's decision because the prosecutor in fact treated defendant differently from a similarly situated individual or inconsistently applied a policy to defendant. Instead, defendant asserts that the prosecutor acted arbitrarily when he aggregated the theft transactions by month, because there was no policy for aggregating theft transactions.

When a defendant does not demonstrate differential treatment, but, as here, claims only that the prosecutor acted arbitrarily in a manner that denied the defendant a privilege or immunity, the prosecutor violates the defendant's Article I, section 20, rights if the prosecutor lacks a rational basis for his or her decision. On this record, defendant's assertion that the prosecutor's decision was arbitrary because it was not based on a coherent, systematic policy for aggregating theft transactions fails under *Clark* and the cases that preceded it. Like the prosecutor's decision to grant immunity to one potential codefendant but not to another in *Clark*, and the similar decisions in *Farrar*, *Buchholz*, and *McDonnell*, the prosecutor here did have a rational basis for his decision. As the prosecutor explained, he aggregated the theft transactions by month for purposes of jury understanding of the case. That was a reasonable and permissible basis for his action and, in this case, satisfies the requirements of Article I, section 20.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.